MATTER OF AGBULOS

In Visa Petition Proceedings

A-19032023

*Decided by District Director October 3, 1969*

Since the marriage by tribal custom in the Philippines in 1919 between the U.S. citizen petitioner and beneficiary's mother is a valid marriage under the applicable laws in existence at that time (General Order No. 68, in force from December 1899 to June 1930, of the U.S. Military Government in the Philippines), beneficiary, issue of the marriage, is eligible for preference classification under section 203(a)(4), Immigration and Nationality Act, as amended, as petitioner's married daughter.

Petitioner is a 78-year-old naturalized United States citizen who was born in the Republic of the Philippines December 14, 1890. He has filed a visa petition to classify his daughter as a preference immigrant pursuant to section 203(a)(4) of the Immigration and Nationality Act, as amended. He has submitted as evidence of his marriage to beneficiary's mother joint affidavits subscribed by two unrelated Filipinos attesting to the fact that petitioner and his wife were married in the year 1919 before a tribe of people in Macaoayan, Burgos, Ilocos Sur., Philippines. The affiants alleged that there was no church nor school in the village and the only recourse to a wedding ceremony was by tribal custom. It is further alleged that the ceremony took place prior to the existence of a town with the result that no formal record of such marriage was even made.

In determining whether this marriage could be considered bona fide for immigration purposes inquiry was made of the Hispanic Law Division of the Law Library, Library of Congress. That Library, in replying, furnished a detailed report which states in part:

. . . it would appear that General Order #68, in force from December 1899 to June, 1930 of the U.S. Military Government in the Philippines, was the applicable and pertinent law. Sections of this Order which should be of interest to you follows:

Sec. V. Marriage may be solemnized by either a judge of any court infe-

rior to the supreme court, justice of the peace, or priest or minister of the gospel of any denomination.

Sec. VI. No particular form for the ceremony of marriage is required, but the parties must declare, in the presence of the person solemnizing the marriage that they take each other as husband and wife.

Sec. IX. No marriage heretofore solemnized before any person professing to have authority therefor, shall be invalid for want of such authority or on account of an informality, irregularity or omission, if it was celebrated with the belief of the parties, or either of them, that he had authority and that they have been lawfully married.

Two cases were discussed in which General Order #68 was considered in reaching a decision regarding the legality of triban marriages in the Philippines. In one case the Philippine Supreme Court states:

Section IX (see previously cited section) is in the nature of a curative provision intended to safeguard society by legalizing prior marriages ...

and again from the Library of Congress:

In 1932, in *People* vs. *Rosil* 56 Phil. 722, a case involving the question of whether the accused committed the crime of parricide when he killed a woman he had married according to their tribal rites, Justice Geo. Malcolm, in a concurring opinion states:

The above statement of facts leaves no room for doubt that the accused was the one who caused the death of the deceased . . . to whom he was married according to the rites of the tribe of the Tagbanuas . . . which rites sanctioned said marriage according to the admission of the accused, and constitutes the crime of Parricide.[1]

From a subsequent report by the Library, it appears that while initially the Philippine Supreme Court limited the provisions of General Order #68 to marriages, celebrated prior to its promulgation, the Court subsequently treated the data of the marriage as material in determining whether a valid marriage had been contracted.[2]

When petitioner registered as an alien in 1940 he showed himself as married with his wife not living in the United States. In petition for naturalization filed in October 1967 petitioner named his wife as Magialena nee Garan, that they were married 1921, and that she lived apart from petitioner in the Philippines. Petitioner has submitted a baptismal certificate showing beneficiary was born March 24, 1921 and baptized March 22, 8. The parents are listed as petitioner and Magdalena Galang. The phonetic Garan listed for petitioner's wife on the Petition for naturalization was added when petitioner was interviewed by a

___

For full text of the report see Appendix A.
For full text of subsequent report see Appendix B.

Naturalization Examiner, and is presumed to be the same person as "Galang" listed on other documents.

Based on the foregoing, it is concluded that petitioner did enter into a valid tribal custom marriage, recognizable as such under the laws of the Philippines in existence at that time. The beneficiary is therefore considered to be the legitimate child of petitioner, and now eligible for preference status under section 203(a)(4) of the Act, as his married daughter. The petition will be granted.

**ORDER:** It is ordered that the visa petition filed by Benyan Domingo in behalf of Catalina Domingo Agbulos be and the same is hereby approved.

## APPENDIX A

### Tribal Marriages under the Laws of the Phillippines

The laws of the Republic of the Philippines on domestic relations have undergone many changes since the Spanish colonization of the islands. For the present, the marriage law in force may be found in the new Civil Code of the Philippines which became effective in August 1950. However, at the time of the celebration of the marriage mentioned in your letter, it would appear that General Order No. 68, in force from December 1899 to June 1930, of the U.S. Military Government in the Philippines, was the applicable and pertinent law. Sections of this Order which should be of interest to you follows:

Sec. V. Marriage may be solemnized by either a judge of any court inferior to the supreme court, justice of the peace, or priest or minister of the gospel of any denomination.

Sec. VI. No particular form for the ceremony of marriage is required, but the parties must declare, in the presence of the person solemnizing the marriage, that they take each other as husband and wife.

Sec. IX. No marriage heretofore solemnized before any person professing to have authority therefor, shall be invalid for want of such authority or on account of any informality, irregularity or mission, if it was celebrated with the belief of the parties, or either of them, that he had authority and that they have been lawfully married.

Other pertinent provisions of the Order relate to qualifications, restrictions, formalities, grounds for annulment, etc. It contains no express provisions relative to tribal marriages. A thorough analysis of the different laws reveals that it was not until 1930 that any such provisions first appeared on Philippine statute books, recognizing "marriages between Mohammedans and pa-

gans . . . in accordance with the rites or practices of their religion" [Sec. 25, Act 3613]. Thus, in a case [e.g., *U.S. vs. Tubban,* 29 Phil. 434], decided under the regime of General Order No. 68, the Philippine Supreme Court states: "We are not advised of any provision of law which recognizes as legal a tribal marriage of so-called non-Christians or members of uncivilized tribes, celebrated without compliance with the requisites prescribed by General Order No. 68." However, in another case involving a tribal marriage decided in 1922 by the same Court, it states:

Section IX [see previously cited section] is in the nature of a curative provision intended to safeguard society by legalizing prior marriages. . . . In moving toward our conclusion, we have not lost sight of the decisions of this court in the cases of *U.S. vs. Tubban* and *U.S. vs. Verzola.* We do not, however, believe these decisions to be controlling. . . .

In 1932, in *People vs. Rosil,* 56 Phil. 722, a case involving the question of whether the accused committed the crime of parricide when he killed a woman he had married according to their tribal rites, Justice George Malcolm, in a concurring opinion, states:

The decision contains the following very significant language: "The above statement of facts leaves no room for doubt that the accused was the one who caused the death of the deceased . . . to whom he was married according to the rites of the tribe of the Tagbanuas . . . which rites sanctioned said marriage according to the admission of the accused, and constitutes the crime of parricide." This means, I take it, the definite abandonment of the doctrine announced in the cases of *U.S. vs. Tubban* and *U.S. vs. Verzola.* With the understanding, therefore, that the decision means a complete reversal of the attitude adopted in the two cases previously referred to, I concur in the result.

Prepared by David M. Valderrama, Legal Specialist Hispanic Law Division Law Library—Library of Congress

# APPENDIX B

## Tribal Marriage under Laws of the Phillippines

The decisions of the Philippine Supreme Court which are digested below have been selected as possibly applicable and helpful to the case before you.

The case of *Adong* vs. *Cheong Seng Gee,* 43 Phil. 43 (1922), concerns a Chinese national, Cheong Boo, who was married in 1895 to Mora (Moslem) Adong, according to the Mohammedan rites prescribed by the book on marriage of the Koran. In upholding the legality of this tribal marriage, the Philippine Supreme Court invokes Section 9 of General Order 68 which provides: "No marriage heretofore soleminized before any person professing to

have authority therefor, shall be invalid for want of such authority or on account of any informality, irregularity, or omission, if it was celebrated with the belief of the parties, or either of them, that he had authority and that they have been lawfully married." The Court, in the dispositive portion of its decision, states:

> Section IX of the Marriage Law is in the nature of a curative provision intended to safeguard society by legalizing prior marriages. . . . In moving toward our conclusion, we have not lost sight of the decisions of this court in the cases of *United States* vs. *Tubban* [(1915), 29 Phil. 434] and *United States* vs. *Verzola* [(1916), 33 Phil. 285]. We do not, however, believe these decisions to be controlling. In the first place, these were criminal actions and two Justices dissented. In the second place, in the Tubban case, the marriage in question was a tribal marriage of the Kalingas, while in the Verzola case, the marriage was performed during the Spanish regime by a lieutenant of the *Guardia Civil*. In neither case . . . was any consideration given to the provisions of Section IX of General Order No. 68. We are free to admit that, if necessary, we would unhesitatingly revoke the doctrine announced in the cases above mentioned.

In the light therefore of the above decision, it would appear that the rule of recognition of a tribal marriage, during the time under consideration, depended on whether it was celebrated before or after the promulgation of the Order; if prior thereto, Section 9 becomes applicable and produces a valid marriage; if subsequent, the contrary result follows. [The facts of *U.S.* vs. *Tubban* (1915) are not clear on when the tribal marriage in question took place.] However, later decisions of the Philippine Supreme Court do not seem to conform to such a rule as the following would show.

People vs. Bituanan, 56 Phil. 23, August 31, 1931, is a case which, like U.S. vs. Tubban, raises the question of whether a certain provision of the Penal Code is to be made applicable to the accused, who in this case, is a Mohammedan married to another in accordance with the rites of their religion. While the facts do not clearly establish the date of the marriage, it is interesting to note that in upholding its validity, the Court cites *Adong* vs. *Cheong Seng Gee* (1922), *supra*, as authority, and invokes, at the same time, "the nature of the provisions of the Philippine Marriage Law." [*i.e.*, General Order 68]

*People* vs. *Rosil*, 56 Phil. 722, March 31, 1932, involves the question of whether the accused committed the crime of parricide when he killed a girl he had married according to the rites of their tribe (Tagbanua). In finding the accused guilty of parricide, the decision is most noteworthy in that it does not go into any detail as to the validity of the marriage. It is not clear from the

facts either as to when the marriage was celebrated  However, Justice Malcolm, in a concurring opinion states:

> The decision . . . contains the following very significant language: "The above statement of facts . . . leaves no room for doubt that the accused was the one who caused the death of the deceased. . . . to whom he was married according to the rites of the tribe of the Tabanuas . . . which rites sanctioned said marriage according to the admission of the accused, and constitutes the crime of parricide." This means, I take it, the definite abandonment of the doctrine announced in the cases of *United States* vs. *Tubban* . . . and *United States* vs. *Verzola*. . . . With the understanding, therefore, that the decision means a complete reversal of the attitude adopted in the two cases previously referred to, I concur in the result.

A case which is probably of greater importance for your purposes, is that of *People* vs. *Bitdu*, 58 Phil. 817, November 21, 1933, where it appears that the accused was married twice to members of her tribe in accordance with Mohammedan rites and customs. It is not clear from the facts exactly when the marriages were celebrated. A careful reading of the decision, however, would seem to indicate that the first marriage was performed while General Order 68 was already in force, and the second, seven months after the accused had secured a divorce from her first husband in accordance with Mohammedan customs. In resolving the question of whether there was bigamy or not, the Court had to decide: 1) the validity of the first marriage; 2) the validity of the divorce. The first was upheld. It is worthy of note, however, that none of the cases heretofore discussed is cited in the decision.

Prepared by David M. Valderrama, Legal Specialist Hispanic Law Division Law Library—Library of Congress